Mr. Noland, you are representing Ms. King. I see you have reserved five minutes for rebuttal and I see you are conducting your argument without any trial board. OK. You can begin whenever you are ready. I think everybody hates that CSI now. That's unfortunately true. May I please report, Mrs. King's demotion for unacceptable work performance was unlawful because she was not responsible for the perceived deficiencies of the Clarksville Post Office. George Chaporas of the Point of Law. I think we need to understand one of the contentions here and that is the complaint about her being terminated in relation to the disability retirement. I understand from the government's brief that she did ultimately receive disability retirement and of course she was on leave without pay before she was discharged. What's the issue here? Well, the issue on the termination is that she should not have been terminated. I understand that, but assuming that she was disabled and not able to perform the essential functions of her position, what's the contention about the relationship between her discharge and the disability payment? I'm confused. I mean, is it correct that she has gotten disability payment? That's correct. She got a disability retirement. So what's she seeking on this theory that I described? She is seeking generally to have her demotion reversed and to be reinstated as a level ES-18 postmaster as of the time of her demotion. But then you were perhaps going to finish. I have the same question. Does she want her job back now or only between the time of the demotion and the time of the disability retirement? She wants to have the demotion vacated so that she can be restored to an ES-18 postmaster from the period of time from when she was demoted. Right. Because that affects the amount of money that she will receive in her disability retirement. So it's basically she's seeking back pay for that period of time when she should have been still working, the difference between ES-18 and 13? Well, that would be true, except it depends on how far back the disability retirement goes. And as I stand here, I cannot give you that information. I did not handle that. But our request to the court is to find that the motion was unlawful to say that she should not have been demoted. She should remain an ES-18. Then as we move forward in the period of time, we come to the point where there's a termination. Well, suppose let's assume hypothetically that she was properly demoted, so she was a 13th. And we also find that she could have been discharged because she wasn't able to perform the essential duties of her office. What's the issue under those circumstances in relation to the personnel manual? Well, if you find that both the demotion and the termination were proper, then I guess I have no argument. But her point is that she got the disability retirement. She wants to have the calculation of disability retirement based upon the level that she should have been in. Now, if the court finds that demotion is proper, then she doesn't get that. You don't give her that relief. So you're saying what's the issue? If the demotion is overturned, the effect, the result for Ms. King is that she gets more in monthly disability payments. The calculation of her retirement benefits is higher because of the fact that it's calculated based on a higher level that she would have been at had she not been improperly demoted. But just to finish this up, and I think I understand this, but I'm not sure. If we turn it around and we were to find that the demotion was permissible, but that there's something wrong with the removal, what's the consequence then? Given that she took disability retirement between, I gather, after the time of the proposed removal. It's a complicated question, Your Honor, and I don't have a quick answer for you on what I would say in respect to Well, you've appealed both of them, so presumably there is a consequence that flows from each. And that's where, I mean, it's not inconceivable, I suppose, that we could conclude. You've made arguments with respect to both, and I'm just wondering if the second isn't really moot. I think, in effect, it has been mooted by reason of the fact that the Postal Service has conceded that she got workers' compensation benefits. This is, I think, more important in terms of the termination. Because the predicate for their terminating her was the fact that she had been on leave without pay for some period of time. And pending during that whole period of time was her claim for OWCP benefits. Eventually, she got those benefits, so that she then retroactively was on the rolls of workers' compensation. And that changed her. I understand that argument, but I think what Judge Brightson and I are asking about is this reliance on the manual, which is a somewhat confusing document. And you're saying they didn't comply with the manual the way they terminated her in relation to the receipt of disability benefits. And I think what we're trying to find out from you is what's the consequence of that argument? What should have happened here? It sounds to me as though what you're really saying is she should have been continued on leave without pay status until she got the disability benefits. I don't see how that would benefit her in any way. Well, I think that really is what the handbook calls for. It is considered to be a regulation of the Postal Service. I think it's contemplated, and it is a confusing document. But I think what's contemplated is if you cannot perform the essential functions of your position and you are eligible as opposed to ineligible for disability retirement, then the paragraphs G and H make it clear, and I think also F makes it clear that they're supposed to wait and see what happens with the disability retirement application to see if you get it. You're not supposed to be terminated. Well, what difference would it make? I mean, she was on leave without pay status. Suppose they kept her on until the disability kicked in. Why would she have recovered more money under those circumstances than she did the way it turned out? I think it is more than an issue of money, Your Honor, and I think it relates to the fact that here is an employee who worked 21 years for the Postal Service, 31 years total for the government, who felt that what was done to her was unjustified and was wrong. And it was an attack upon her integrity as a human being and as an employee. And it is important to her that what she believes to be two unlawful acts, the demotion and the termination, that a court recognize that, that this was not done properly. Does it make a difference in terms of the monetary calculation? I think it will in terms of the calculation of disability retirement benefits. Because of the demotion? Correct. But only because of the demotion? Correct. I don't know that the termination will affect the situation, but in terms of what was done improperly, it will be a vindication for her because what happened to her, she strongly believes, and I think it's supported by the record, was really unconscionable. The agency really is supposed to follow its own rules and regulations. And with respect to the demotion, that was not done. She's held accountable for the actions or responsibilities of someone else. I don't think that's really disputed here. Shapouris was the officer in charge. Are you talking now about the fact that when she came back on board, I guess it was early January, that she didn't sign a form saying that she was now responsible? Correct. I mean, I can understand the significance of that document and its place in the scheme, but really isn't the key thing is someone maybe doesn't sign the document, but in fact they are managing the facility. Does it make any difference? Well, she wasn't managing the facility. Well, that's another issue about whether this wasn't Mr.—what was his name? The gentleman who was there with her? Shapouris was the officer in charge. But then there was someone who was sent there. Mr. Schnepp was sent to run the day-to-day operations, and then she was put in an office and told to perform paperwork. It was all very confused and bungled. Probably the best illustration I could give to the court is at page 164 of the joint appendix when Robert Otto, who was the proposing official, is being questioned about why he put 15 PIPs into effect when he first got the position of the manager of postal operations. And he talks about the fact that he's asked specifically, why did you issue Mrs. King a PIP? And he says, well, I issued it primarily for the office that Mrs. King was the postmaster, the same as I did in other offices where the postmasters weren't, you know, there. If it was an officer in charge there, I issued it to the officer in charge. That illustrates the point. He didn't know that Mrs. King wasn't the postmaster, that the office had not been transferred from Shapouris, the officer in charge, to Mrs. King. And otherwise, had he known that, he would have issued the PIP to Shapouris. If you would agree with me, aside for the moment the facts of this case, you could have a situation where the 971 document is not signed, yet there's no question that Mr. A, for example, is running the post office. There could be examples of that in temporary circumstances. But where the actual transfer is made in accordance with the postal regulation, it is described on the record as completely unusual, abnormal. Nobody had ever seen it happen before in the way it happened here. So it's not just a formality of paperwork. It's a requirement of the postal service. Shapouris knew what he was getting into when he assumed the responsibilities of the postmaster of Clarksville. Mrs. King, when she came back, was, why aren't they transferring the office to me? And apparently it was the acting manager, Ms. Moore, had it in her mind that Mrs. King wasn't going to stay there. That she had held back a 15-level office and tried to convince her, oh, you really don't want to be postmaster here. Just do the administrative duties for now, and Schnepp will run the operation. Within the same month, she is no longer the acting. In comes Robert Otto as the now manager. He doesn't even know the office hasn't been transferred to Mrs. King, and proceeds on the assumption that it has been, and therefore it's her responsibility. You're into your rebuttal, and I will restore your entire rebuttal, because you did get a fair number of questions. But let's, at this point, Mr. Nolan have his full five minutes on rebuttal. But let's hear from the government now. Ms. Stewart? I guess first I will address the court's questions about the effect of the two personnel actions. And our analysis is actually that there's no effect from the administrative separation. In fact, that was a permissible action both under our own handbook and under the workers' comp regulations. Suppose it wasn't. Suppose the manual was violated. What would the consequence of that be? Well, my understanding is there's no monetary consequence, because the workers' comp benefits she got are at level 18. And they've continued through until the point that she took disability retirement. Now, there may be a disagreement between me and Mr. Nolan, but it's also my understanding. And I'm sorry this is all outside of the record, but obviously it's later than the time of the board litigation. But it's also my understanding that she opted to go back on workers' comp after having gotten retirement disability for a short period of time. So monetarily, she's always gotten her benefits at level 18, so there's no monetary effect arising from the administrative separation. It's permitted by the workers' comp regulations. I can cite the court to the regulation. And she has the right, once she recovers, to invoke the rights under the workers' comp scheme to restoration. And if she disagrees with our decision to restore her at that point, the board has jurisdiction over that claim. So there is no— So you're saying, Mr. Rookett, that the key claim, the key issue is the demotion issue. Yes, yes. And we obviously believe that the demotion was proper. And on that issue, I just wanted to respond to some of the things that Mr. Nolan had said about who, in fact, was operating this post office during the relevant time. The testimony was that Ms. King returned to the post office January 8, 2001. And Mr. Schnepp was put in the post office until about a month later, four or five weeks later, to assist her. Now, that was done because when Ms. King—prior to that point, in late 2000, when Ms. King was out, there had been a climate assessment. And one of the recommendations was to give her a supervisor to allow her to get caught up on the administrative duties in the office. That's exactly what Ms. Moore did. She gave Mr. Schnepp, who was an operational supervisor, to the Clarksville post office for 30 days or so. And at the end of that period in January, Mr. Otto comes in as the new manager of post office operations and puts Ms. King on this performance improvement plan. Let me ask you—I'm sort of just picking up a little bit on the argument that Mr. Nolan was making. Mr. Nolan says, well, you know, this was Mr. Otto's management approach. He came in and he gave performance improvement plan instructions to a host of postal facilities. So I guess what he's saying is that this wasn't directed to her personally. She comes back January 8th, 9th of 2001. When did she receive the performance improvement plan? That's, I believe, January 31st. Was that based on—assume it's directed at her personally, it would have to be based, I guess, would it not, on performance for roughly a two-week period there? Well, the significance of the PIP is not that it's directed at her prior performance before that point, but it was a management tool that Mr. Otto used to track all of the post offices in the Baltimore district that were underperforming relative to our standards. So it was for the whole post office? It was for the whole post office, and in fact, he testified that every postmaster whose office fell into that category got a PIP. For example, Ms. Moore, who had not been at the Columbia post office for some time because she was acting as the manager for the entire Baltimore district, she got a PIP. So it's different. I mean, normally the situation we see is where an individual employee is having a problem, and he or she is put on a performance improvement plan for 90 days or six months or whatever, and then they're evaluated at the end of that period. That's not what we have here. No, Mr. Otto is very clear in his testimony that it was a management tool to allow him to track the performance of these about 15 offices that were underperforming. So you're saying the term performance improvement plan, we should think of it differently than the way we usually think of it in these personnel cases. Right. It wasn't targeted to her individual performance before January 31st. Now, there is some significance to the PIP because what it did is it listed a number of things that the office was to improve on and which Mr. Otto was going to hold Ms. King accountable for. Delayed mail, the housekeeping, the overtime hours of the clerks and the carriers, things like that. The PIP also set up a system. Mr. Otto set aside one day every week to have a telephone conversation with each of these 15 postmasters. Ms. King did that for the entire time until March when she went out on administrative leave. She never in that time said to Mr. Otto, I'm not responsible for the Clarksville post office. She acted as if she were responsible. She believed herself to be responsible in these weekly conferences with Mr. Otto. Now, going forward, the testimony was that in early February, Mr. Schnapp actually is no longer resident in Clarksville. He gets recalled back to the Baltimore District Home Office to assist Mr. Otto, who is unfamiliar with operations in Baltimore. He's come from the West Coast. And so for the last month prior to March 6, 2001, there was no one else resident in the Clarksville post office with supervisory authority other than the petitioner. So, in fact, that's another interesting fact, Judge Bryson. He overlapped with the petitioner for one day on January 8th. But he left in early January then? Yes, he reported to work on January 8th not knowing that she was returning. And when she returns, he leaves. And, in fact, her testimony was she had not seen him a day since January 8th, 2001. So when you look at factually what was going on on the ground in Clarksville, there was a 30-day period or thereabouts, four or five weeks, where Mr. Schnapp was there to help her persuade to the recommendations in the climate assessment. And from that point on, she was there. So that's the kind of fact pattern in the first couple months of January 2001. I don't know if there are any more questions about the facts of the timeline or anything like that. And then, obviously, with respect to this argument about the 971s, clearly we're not proud of the fact that our paperwork is trailing behind what was going on in that actual post office. But it's not uncommon. Mr. Schnapp was never – a 971 was never executed for the time that Mr. Schnapp was there in late 2000 when Mr. Chapurris was out. It's often the case that if we need someone to fill in for a week or two here, something like that, we don't always execute a 971. And in this case, it was an oversight and probably had to do with Ms. Moore not letting Mr. Otto know about that. And it was discovered when this financial audit is done in March 2001. So it's just merely an oversight, and it's paperwork, and it clearly was just trailing behind what was actually going on in the post office. I don't know if the court has any other questions. I have one question. Going to the employment and placement – what is it? The manual. I'm not sure the exact name. I take it – well, I won't take it. I'll just ask. What is the right way to deal under the manual with someone who is both in the estimate of the Postal Service disabled but is eligible for disability retirement? Is that person separated for disability? I obviously am having trouble with this definitional section, which is contrary to the usual way that in federal agencies these things are expressed, which is you say if this person is disabled, they can be separated for disability, and they are entitled at that point to apply for and may well be eligible for disability retirement. Your manual seems to have the opposite approach. So my question is what happens to somebody who is eligible, as she was, but in the estimate of the Postal Service is in fact disabled? Well, first of all, I think anyone upon reading the definitional section has to admit that it's a little confused. And the Baltimore district HR manager testified that they used this first definitional section just to identify people who fall into the categories in the next section, that section about applicability. I don't know if that answers your question. Well, not really, because that would leave her out. Okay. Right? Because she was eligible. So if you follow a strict, if you follow that approach, you'd say, all right, well, is she in the definition? Well, no, she's eligible for disability. Out she goes. That can't be right. That can't really be. Well, you can look at what actually happened to her, which is that this options letter was sent. It listed a number of options, one of which was to apply for disability retirement and to give her notice that, in fact, she had the right. Should she be separated administratively, she had the right for up to a year after the effective date of the separation to still apply for disability retirement. So. Well, I was trying to make sense of this, and this is 286 and 287 of the appendix, that you have the definition at first and then you have G and H on the next page. Right. Tell me if this is right, that at least as this is set up, you would say, well, for somebody that's not eligible for retirement, they can be separated for disability and then they're on their own to try to figure out how they can handle the issue. But for somebody who is eligible for retirement, there are two different routes, one of which is the G route, in which if the person does not want to, they don't want to apply for disability retirement, you can get rid of them, but you have to go through the whole medical process. Right. Under the regulation, it's all you can do, and then you have the special case of mental disability. Right. Which is H. But as I understand, that really wasn't the way the procedure worked out in this case, right? Well, what actually happened is the options letter was sent. Right. She elected in response to that letter to apply for disability retirement. We sent that paperwork out to her. And then subsequent to that point, we sent her a notice actually invoking 365.342C about being in leave without pay status for a year or more. And she did not respond at all to that notice of her proposed separation, and so the deciding official then separated. Of course, again, if you read this strictly, having defined separation for disability is involving people who aren't eligible. This whole 342C wouldn't apply to her. Right. I guess what you're really saying is that the definition is wrong. What's wrong? It's not what you do, right? Yeah, I mean, that's basically what Ms. Otto's testimony was, which is that she said we open up the elm and we look for whether the employee is incapable of performing the duties of their position. Okay. Is the manual being revised? Not that I know of, Your Honor, but we have a lot of manuals. Do you know the way to the general counsel's office? I'll put this on our list of things that probably in our evening we have so many manuals that probably need to be changed. One thing that I wanted to point out before my time is up is in addition to the elm, which is certainly one of our regulations, I just wanted to cite the court to 5 CFR 353.106. And subparagraph B says an employee absent because of a compensable injury may be carried on leave without pay or separated unless the employee elects to use sick or annual leave. It's a workers' comp regulation that covers the entire federal workforce, not just specific to us. In this case, she was absent due to a compensable injury, and the regulation then gives us the discretion to either continue to carry her on leave without pay or to separate her unless she's elected to use sick and annual leave. So she's actually trying to use the workers' comp status to void the rights under the elm. And, in fact, the exact opposite is true. What the elm does is implement this provision in the CFR and actually give the employee an extra year of leave without pay. And she had exhausted that extra year, and that's when the action, the administrative separation, was effectuated. So I don't know if the court has any more questions. Thank you. I think your time has expired. Mr. Noland, as I said, you have your full five minutes. We'll give you five minutes of rebuttal. Thank you, Your Honor. I appreciate that. Your Honor, I have not had the opportunity to look at 5 CFR 353.106. Here you go, Mr. Noland. What was the number again? 353.106. I would like to have the opportunity after today to perhaps look at it. If I have anything, I would like to be able to submit it in writing, if that would be okay with the court. We always First, I've seen it or heard about it. I think just a comment, Mr. Stewart. I do think it's useful to give something like that to counsel before the argument so that they can look at it. It's always difficult for somebody to respond to something if they haven't had all the time to see. And also, the fact that workers' comp, they had denied her workers' compensation claim, or it had been denied all the way through to the point where, I don't know if you can recall in the brief, a letter was sent to the wrong address after a psychiatric evaluation saying it was an acceptable claim. We go for a period of time through almost to the conclusion of the hearing, and as part of the deposition find out that the claim was accepted. Of course, at that point, she hadn't filed the CA-7s. So then she goes ahead and files the CA-7s. Eventually, the claim is paid. Of course, then there's a big dispute between Paulette Otto and her injury compensation specialist because the claim was approved by the injury compensation specialist. I don't know how this What bearing does that have on this case? Because as I understand it, you can be on OWCP, COP is what it's called, right? Continuation of Pay, isn't that the strict term? I call it OWCP benefits. Okay, all right, benefits, whatever they are. But you can be eligible for and be receiving those benefits, but also be on leave without pay status from your agency, right? That's not what Paulette Otto said in her testimony, and it's my position that But she's not right about that. It seemed to me that if I understood the board cases, what you can't do is you can't make the person AWOL. In other words, if they're getting benefits from the Labor Department, and the Labor Department's found they're injured, so you can't say, well, you're actually on leave. But you can be leave without pay. You're not being paid by the agency, you're being compensated through benefit system from the Department of Labor, right? That would appear to be the case. However, my argument is that under the facts of this case, the termination disability never would have happened had the claim been approved when it should have been approved. She knew about it and had filed the CA-7s, and it had gone back to the point to be covered from October of 2001. But she would have still been under leave without pay for more than a year, though. I mean, her leave without pay status wouldn't have changed. That is conceivable. I don't think they would have had her in that category based on Otto's testimony. Oh, I see what you're saying. In other words, you're saying that notwithstanding whatever the strict rules are, the Postal Service wouldn't have put her in that category. That's my understanding of it. Mr. Noll, if you want to respond to the regulation that the steward gave you, why don't you, if you could, have any response within seven business days? By the close of business next Thursday, the 16th. Thank you, Your Honor. I may not find it necessary, but I'd like to have that opportunity. If the court doesn't receive anything by that time, we'll just assume you have nothing to say on it. Back to a question asked by Judge Bryson regarding 365.342C. The agency made it very clear that that's what they were proceeding under, nothing else. And this appears at page five of the reply brief, and it cites the actual testimony of Paulette Otto on that point. And it's actually in the letter proposing her termination of stability. So we're under paragraph C, and I don't believe it applies to Ms. King. It applies to someone who is ineligible for disability retirement. Because of the definition. Correct, exactly. So then you read farther down, then they deal later with people who are eligible, but people under C are people who are not eligible for disability retirement. So they brought the whole action on the wrong section. I mean, I submit that it should never have been brought to begin with. If they did bring it, then she should have been given the opportunity to make the application and get the disability retirement. And if she doesn't make the application, and she did, then she can be terminated of disability under this section. Yeah, but the problem is that the failure to comply with the manual doesn't seem to have any financial consequences that are adverse to her. Well, Your Honor, I think it's because of all the different claims, disability retirement, and frankly, I'm not conversant with all of the facts of those related to Mrs. King. And certain references to things not in the record have been presented here today. I have no way that I can stand here and rebut that because I just don't know. But it is important, Your Honor, to posture this case in a way that if something was done wrong in terminating this lady, it should be reversed. And if nothing else, even if there's no economic consequence, then at least she will have the... You would want the point duly noted, even if it doesn't... Exactly. So that she can then go on with her life and say, you know, I was found not to be terminated, I was not demoted properly, now I'm going to move on with my life. But it's important for her own personal integrity that this court give those issues serious consideration. I know the court will. And... Again, I hate to continue to keep coming back to this, but you say she was removed. Well, actually, I guess there was a proposed removal, but there was never an actual action of removal, right? She was terminated from the postal service. Well, but I thought that she applied for and was granted disability retirement after the proposed removal, but before any removal action. Am I wrong about that? I think you're correct. There was, I believe, a letter of decision. She didn't get the disability until November, right? But she applied for disability in April, right? Was it April or May? April, correct. And then they said she hadn't done anything in response to the options letter, and therefore on page 299 of the joint appendix, May 28, 2003, letter of decision terminating her from the postal service, is when I wrote a letter to the district manager and said, hey, you can't do this under this section. She's eligible for disability retirement. He wrote me back and said, I disagree. That's page 299 of 303 of the record. Okay, but by that time she had already applied for disability. She had, yes, but it had not been approved. It hadn't been acted on. Correct. I see I'm beyond my time unless the court has further questions. I think that's it. I think that's it. Yes, get that in the subcommittee and please let us know what you're going to say.